Filed 1/24/22

# CERTIFIED FOR PARTIAL PUBLICATION*


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO


| | |
|---|---|
| NORTH AMERICAN TITLE COMPANY, INC., | B303753 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC660525) |
| v. | ORDER MODIFYING OPINION AND DENYING REHEARING |
| EGYA NUBAR GUGASYAN et al., | |
| Defendants and Respondents. | NO CHANGE IN THE JUDGMENT |


THE COURT:

---

\* This opinion is published as to all but parts I.B.3., II., and III. of the Discussion.

It is ordered that the opinion filed on December 29, 2021, be modified as follows:

1. At the end of the first paragraph on page 12 (which ends with a citation of *New Albertsons, Inc. v. Superior Court* (2008) 168 Cal.App.4th 1403), insert footnote 7, and renumber all subsequent footnotes. Footnote 7 should read:

    [7] In a petition for rehearing, North American argues that it was denied its right under Government Code section 68081 to brief this precedent. This argument lacks merit. That section grants the right to brief new *issues*, and the *issue* of section 1185's meaning was extensively argued in the parties' briefs. It is well settled that "Government Code section 68081 does *not* give the parties a right to submit supplemental briefs when an appellate court relies upon authority that was not briefed by the parties . . . ." (*Gee v. Greyhound Lines, Inc.* (2016) 6 Cal.App.5th 477, 487, fn. 6; *People v. Alice* (2007) 41 Cal.4th 668, 679.)

2. At the end of page 12 and continuing onto page 13, in the sentence that begins, "If the resulting license is similarly genuine looking," insert the words "ability to invoke the safe harbor (and consequently, his probable" before the phrase "liability for damages," and then insert a closing parenthesis after the word "damages," so that

2

the sentence reads:

> If the resulting license is similarly genuine looking—and hence the notary's conduct in being reasonably duped is the same—in these two scenarios, why should his ability to invoke the safe harbor (and consequently, his probable liability for damages) turn on such distinctions?

3. On page 18, in the third sentence and paragraph beneath subheading B.3., insert footnote 8 after the first semicolon (ending the first of four numbered items).  Footnote 8 should read:

> [8]    For the first time in its petition for rehearing, North American argues that notaries should *never* be able to invoke the safe harbor on the basis of a declaration regarding their "usual custom and practice"; allowing them to do so, North American continues, would erode the safe harbor and incentivize notaries to forget the transactions they notarize.  Aside from being raised too late, this argument lacks merit.  The underlying supposition of this argument is that a notary's lack of memory is inauthentic, yet the evidence in this case suggests notaries handle a large number of transactions that are similar and routine in nature; that notaries do not have eidetic memories is neither surprising nor

cause for alarm.  More broadly, the Evidence Code specifically contemplates admission of habit evidence in precisely these situations. (Evid. Code, § 1105.)  We are without power to excise this statute from the Evidence Code.

There is no change in the judgment.

Appellant's petition for rehearing is denied.

_____

ASHMANN-GERST, Acting P.J.   CHAVEZ, J.    HOFFSTADT, J.

Filed 12/29/21

**CERTIFIED FOR PARTIAL PUBLICATION\***


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO


| | |
|---|---|
| NORTH AMERICAN TITLE COMPANY, INC., | B303753 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC660525) |
| v. | |
| EGYA NUBAR GUGASYAN et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael L. Stern, Judge.  Affirmed in part, reversed in part and remanded for further proceedings.

---

**\*** This opinion is published as to all but parts I.B.3., II., and III. of the Discussion.

Steyer Lowenthal Boodrookas Alvarez & Smith, Jeffrey H. Lowenthal, Carlos A. Alvarez, and Jill K. Cohoe for Plaintiff and Appellant.

Freeman Mathis & Gary, Frances M. O'Meara, Stephen M. Caine, and Holly M. Teel for Defendants and Respondents Egya Nubar Gugasyan and Jack Aintablian.

Law Offices of John L. Fallat, John L. Fallat, and Timothy J. Tomlin for Defendant and Respondent Western Surety Company.

* * * * * *

The job of a notary is to verify that the person executing a document is, in fact, the person who is supposed to be executing that document. If the notary is "neglect[ful]" in this job, the notary is civilly liable for damages. (Gov. Code, § 8214.) However, California law nevertheless sets up a presumptive "safe harbor" for notaries (1) if, as pertinent here, the notary is presented with "[a] driver's license *issued by the Department of Motor Vehicles*" (the DMV) that is current or issued within the preceding five years, *and* (2) if there is an "absence of information, evidence, or other circumstances that would lead a reasonable person to believe that the person [appearing before the notary] is not the individual he or she claims to be." (Civ. Code, § 1185, subds. (b), (b)(3)(A), (c), italics added.)[1] This appeal requires us to define the scope of this statutory safe harbor. We ultimately conclude that the safe harbor (1) applies when a notary relies upon a driver's license that looks like one the DMV

---

[1] All further statutory references are to the Civil Code unless otherwise indicated.

2

would issue (and thus does not require a notary to verify with the DMV that the driver's license is, in fact, a legitimately issued license), (2) applies even if an expert opines that industry custom requires a notary to do *more* than the statutory safe harbor requires, and (3) is not overcome by the simple fact that the person who appeared before the notary was an imposter. Accordingly, we affirm the grant of summary judgment on negligence-based claims against the two notaries in this case as well as the surety that insured them. In the unpublished portion of the opinion, we affirm the dismissal of two other claims without leave to amend, but reverse the trial court's dismissal of a party whose liability is not tied to the notaries' acts.

## FACTS AND PROCEDURAL BACKGROUND

### I. Facts

Noble Investments LLC owns property on North Elm Street in Beverly Hills, California. The company's president is Mark Gabay (Gabay).

In January 2017 and again in February 2017, someone pretending to be Gabay applied for two loans totaling nearly $4 million, each loan to be secured by deeds of trust against the Elm Street property. For each loan, the person lined up Finance for Americans Corp. (Finance) as the broker, Lone Oak Fund, LLC as the lender, and North American Title Company, Inc. (North American) as the escrow holder.

From its list of preapproved notaries, North American called Jack Aintablian (Aintablian), doing business as "Jack the Notary," to notarize the two deeds of trust.

On January 16, 2017, and then on February 17, 2017, Aintablian tasked one of his contractors, Egya Nubar Gugasyan (Gugasyan), with acting as notary for the two deeds of trust.

Gugasyan's surety, whose job it was to insure against any errors by the notary, was Western Surety Company (Western). During each appointment, a person purporting to be Gabay appeared and provided Gugasyan a California driver's license (No. B8141711) as proof of his identity. Gugasyan's "custom and practice" "[a]t all relevant times herein" was to (1) compare the photograph of the person on the license with the person before him, (2) compare the signatures on the license, on the deed of trust signed in his presence, and in the notary journal Gugasyan had the person sign, (3) compare the names on the license and on the deed of trust, (4) review the texture and color of the license to make sure it was authentic, and (5) decline to notarize the deed of trust if any of the prior four steps revealed something unsatisfactory. After undertaking these steps and seeing nothing untoward, Gugasyan recorded in his notary journal the person's driver's license information as well as an impression of the person's thumbprint. The person then signed each deed of trust as Mark Gabay on behalf of Noble Investments LLC. Gugasyan then executed, under penalty of perjury, an "acknowledgement" attesting that:

> Gabay had "personally appeared" in front of him and "proved to [him] on the basis of satisfactory evidence to be the person[] whose name[] is[] subscribed to the within instrument and acknowledged that he[] executed the same in his[] authorized capacity[], and that by his[] signature[] on the instrument the person[], or the entity upon behalf of which the person[] acted, executed the instrument."

Once the two deeds of trust were executed, North American disbursed $3,891,935.35 into a bank account held at JPMorgan

Chase Bank (Chase) and a $40,000 broker's fee to a bank account for Finance at Wells Fargo Bank, N.A. (Wells Fargo).

As it turns out, the person executing the two deeds of trust was *not* Gabay and the California driver's license presented to Gugasyan was fake (because the DMV had assigned that license number to someone else).

## II. Procedural Background

### A. *Initial pleadings*

On May 9, 2017, North American sued Wells Fargo, Chase, and Finance. The same day, North American sought and obtained a temporary restraining order prohibiting Wells Fargo and Chase from transferring the funds in the disbursement accounts. Unfortunately, by this time, only the $40,000 broker's fee remained in the Wells Fargo account; the $3,891,935.35 in the Chase account had been transferred to other bank accounts in Dubai.

In June 2017, North American filed a first amended complaint that added Aintablian, Gugasyan, and Western as additional defendants. Against Aintablian and Gugasyan (collectively, the notaries), and as pertinent here, North American alleged claims for (1) declaratory relief, based on "[a]n actual controversy . . . between North American and [the person who impersonated Gabay] . . . that North American is entitled to the return of the Stolen Funds," (2) negligent misrepresentation, based on the representations in Gugasyan's acknowledgment that the person appearing before him was, in fact, Gabay, (3) negligence, based on Gugasyan's negligence in verifying the identity of the person purporting to be Gabay, and (4) negligence

per se, based on the same negligent act.[2]  Against Western, North American sought to collect on the notary bond due to Gugasyan's negligence.  As for damages, North American sought to recover against the notaries the stolen loan funds plus interest, attorney fees under the "tort of another" doctrine, and punitive damages.

**B.     *Demurrer and second amended complaint***

The notaries demurred, and also moved to strike the allegations seeking recovery of attorney fees and punitive damages.  Following briefing and a hearing, the trial court overruled the demurrer with respect to the negligence and negligence per se claims, but sustained the demurrer without leave to amend with respect to the declaratory relief and negligent misrepresentation claims.  The court also struck the attorney fees and punitive damages allegations.  The court ruled that "no new parties and no new causes of action [are] to be pled without a court order."

In October 2017, North American filed a second amended complaint realleging the same claims for negligence and negligence per se against the notaries.

**C.     *Motion for summary judgment***

The notaries moved for summary judgment on North American's claims for negligence and negligence per se on the ground that (1) they were not negligent as a matter of law because they complied with the safe harbor requirements of section 1185, and (2) North American's damages were not proximately caused by their actions.  Following briefing and a

---

[2]     North American alleged three further claims against the notaries that it subsequently abandoned—namely, claims for (1) breach of implied contract, (2) fraud and conversion, and (3) money had and received.

hearing, the trial court granted the motion. Specifically, the court ruled the notaries had met "their burden to show there was 'satisfactory evidence' provided" to verify Gabay's identity; that this burden triggered section 1185's presumption that the notaries "acted in accordance with the applicable provisions of law"; and that North American had not rebutted that presumption.

### D. *Dismissal order and appeal*

Although the summary judgment motion only formally dealt with the notaries, the trial court's minute order "dismissed" the "entire case" "[w]ith [p]rejudice." Although by this time North American had dismissed Wells Fargo and Chase from the case, North American still had claims pending against Western, and against Finance, against whom a default had been entered.[3]

North American filed a motion to set aside the dismissal of the entire action, but while that motion was pending filed a notice of appeal specifically challenging the scope of the dismissal as well as the summary judgment ruling. Seeing that the pending appeal covered the scope of the dismissal, the trial court took North American's motion off calendar for lack of jurisdiction.

### DISCUSSION

North American argues that the trial court erred in (1) granting summary judgment for the notaries on its negligence and negligence per se claims, (2) sustaining the demurrer to its declaratory relief and negligent misrepresentation claims against

---

[3] North American also had claims pending against a private banker who had arranged for Chase to open up the account into which the funds were disbursed, but does not challenge the dismissal of those claims in this appeal.

7

the notaries without leave to amend, and (3) dismissing Western and Finance from the lawsuit.[4]

## I. Summary Judgment Ruling

### A. *Pertinent law*

#### 1. *Summary judgment, generally*

Summary judgment is appropriately granted "where 'all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" (*Hartford Casualty Ins. Co. v. Swift Distribution, Inc.* (2014) 59 Cal.4th 277, 286 (*Hartford Casualty*), quoting Code Civ. Proc. § 437c, subd. (c).) In other words, summary judgment is warranted where "the plaintiff has not established, and reasonably cannot be expected to establish, one or more elements of the cause of action in question." (*Patterson v. Domino's Pizza, LLC* (2014) 60 Cal.4th 474, 500.) ""'We review the trial court's decision [granting summary judgment] de novo, considering all the evidence set forth in the moving and opposing

_____

4  While North American appealed from the order granting the notaries' summary judgment motion and this court has jurisdiction only over an appeal from the subsequent judgment that follows the order (*Thompson v. Ioane* (2017) 11 Cal.App.5th 1180, 1189; *Mukthar v. Latin American Security Service* (2006) 139 Cal.App.4th 284, 288 (*Mukthar*)), we nevertheless exercise our discretion to entertain North American's appeal. (*Taylor v. Trimble* (2017) 13 Cal.App.5th 934, 939.) That is because the trial court docket in this matter indicates that the case was indeed dismissed (*Mukthar*, at p. 288 [where order is followed by judgment, appellate court may deem premature notice of appeal to have been filed after entry of judgment]), and because the notaries will not be prejudiced since they do not raise any appealability arguments and instead fully respond to the merits of the appeal.

8

papers except that to which objections were made and sustained.'" [Citation.] We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party.'" (*Hartford Casualty*, at p. 286.)

### 2. *Law governing notaries public*

By statute, a notary public may be civilly liable for damages for his "neglect." (Gov. Code, § 8214.) Thus, like other persons, notaries may be held liable for negligence or negligence per se if they violate their duties. (*Issakhani v. Shadow Glen Homeowners Assn., Inc.* (2021) 63 Cal.App.5th 917, 924, 935; *Lockheed Martin Corp. v. Superior Court* (2003) 29 Cal.4th 1096, 1106 & fn. 6.) However, "because of the important function notaries serve in our society, their duties are prescribed by law." (*McComber v. Wells* (1999) 72 Cal.App.4th 512, 519.)

Section 1185 prescribes the duties of a notary public when verifying the identity of the person who appears before him or her to execute documents.[5] Subdivision (a) of section 1185 provides that the notary may not "acknowledge[] . . . an instrument" "unless the [notary] has *satisfactory evidence* that the person making the acknowledgment is the individual who is described in and who executed the instrument." (§ 1185, subd. (a), italics added.) Subdivision (b) explains that a notary has "satisfactory evidence" of a person's true identity if (1) there is no "information, evidence, or other circumstances that would lead a reasonable person to believe that the person making the

---

[5] Notaries are also subject to the provisions of Government Code sections 8200 et seq., including the requirement that they maintain specified information regarding each transaction in a sequential journal (§ 8206).

acknowledgment is not the individual he or she claims to be" and, as pertinent here, and (2) the notary is "present[ed]" with and "[r]easonabl[y] reli[es]" upon a "driver's license issued by the [California] Department of Motor Vehicles" that is "current or has been issued within five years." (*Id.*, subds. (b) & (b)(3)(A).) If the notary follows these steps, the notary "shall be presumed to have operated in accordance with the provisions of law" and thus presumed to have acted in a nonnegligent fashion. (*Id.*, subd. (c).) In other words, compliance with the procedures of section 1185 places a notary into a "safe harbor." (*Joost v. Craig* (1901) 131 Cal. 504, 519 (*Joost*) [if "[a] notary . . . take[s] all due precautions and fully compl[ies] with [section 1185]," "he would not be held liable"]; *Anderson v. Aronsohn* (1919) 181 Cal. 294, 299 (*Anderson*); *Transamerica Title Ins. Co. v. Green* (1970) 11 Cal.App.3d 693, 703 (*Transamerica*) ["When the notary does not obey the statute, he is liable"].) However, just because a notary fails to satisfy the requirements of the "safe harbor" does not mean the notary is automatically liable; the plaintiff must still establish that the notary was "negligen[t]" or otherwise engaged in "misconduct." (§ 1185, subd. (d).)[6]

B.    *Analysis*

North American argues that the trial court erred in granting summary judgment for two broad reasons: (1) the court made several errors in interpreting the meaning and effect of section 1185's "safe harbor," and (2) even if the court properly

---

[6]    Although language in *Transamerica* could be read to suggest that noncompliance with the safe harbor establishes negligence per se (*Transamerica*, at p. 703), *Transamerica* predates the enactment of subdivision (d), which clearly places the burden upon the plaintiff to prove the notary's "negligence or misconduct." (Stats. 1982 , ch. 197, § 1.)

10

interpreted the "safe harbor," there are numerous other reasons that preclude the entry of summary judgment.

1.    *Interpreting section 1185's "safe harbor"*

North American urges that the trial court erred in construing what is required to fit into section 1185's "safe harbor." Specifically, North American argues that the "safe harbor" is (1) satisfied only if the driver's license presented to the notary was a genuine license actually issued by the California DMV (rather than a genuine-looking but fake license), (2) satisfied only if the notary complies with all other industry customs, which may be defined by expert testimony in a specific case, and (3) is automatically negated if the person appearing before the notary turns out to be an imposter. These arguments require us to engage in our own independent analysis of section 1185 (*Union Medical Marijuana Patients, Inc. v. City of San Diego* (2019) 7 Cal.5th 1171, 1183 ["Statutory interpretation is 'an issue of law, which we review de novo'"]), and we reject each of these arguments.

a.    *Does section 1185 require that the driver's license presented be issued by the DMV?*

A notary's acknowledgement of a document falls within section 1185's safe harbor if the person appearing before him provides a driver's license that reasonably appears to have been issued by the DMV, even if it was not *actually* issued by the DMV. We so conclude for two reasons.

First, this is how similar language has been interpreted in other contexts. Akin to section 1185, Business and Professions Code section 25660 erects a statutory safe harbor for persons selling alcohol to minors if they verify the buyer's age by looking at a "valid motor vehicle operator's license" "issued by a . . . state

11

. . . government[] or . . . agency." (Bus. & Prof. Code, § 25660, subd. (a)(1).) Courts have concluded that the safe harbor applies to "fake ID[s] purporting to be issued by a government agency" because "[t]he [alcohol seller] should not be penalized for accepting a credible fake that has been reasonably examined for authenticity and compared with the person depicted." (*Department of Alcohol Beverage Control v. Alcoholic Beverage Control Appeals Bd.* (2004) 118 Cal.App.4th 1429, 1444-1445 (*Department of Alcohol*).)  Because Business and Professions Code section 25660 uses a driver's license to verify a person's identity and because its language requiring a license "issued by a . . . state government or agency" has been construed to reach "credibl[y]" "fake ID[s]," we conclude that section 1185—which serves an identical purpose and uses nearly identical language— should been given the same construction.  (E.g., *New Albertsons, Inc. v. Superior Court* (2008) 168 Cal.App.4th 1403, 1419 ["The use of identical terms in two different statutes serving similar purposes suggests that the Legislature intended those terms to have the same meaning in both statutes"].)

Second, the construction urged by North American would lead to absurd results, which we are to avoid in interpreting statutes.  (*Lucent Technologies, Inc. v. Board of Equalization* (2015) 241 Cal.App.4th 19, 34; *John v. Superior Court* (2016) 63 Cal.4th 91, 96.)  If, as North American suggests, section 1185's safe harbor only applies if the notary verifies that the driver's license presented to him was genuinely issued by the DMV, then a notary would fall *outside* the safe harbor if the imposter presents a wholly fake driver's license but would fall *inside* the safe harbor if the imposter duped the DMV into issuing a license. If the resulting license is similarly genuine looking—and hence

12

the notary's conduct in being reasonably duped is the same—in these two scenarios, why should his liability for damages turn on such distinctions?  (*Department of Alcohol*, *supra*, 118 Cal.App.4th at pp. 1444-1445 [making similar observations].)  Further, North American's construction of the safe harbor would necessarily obligate notaries to contact the DMV to verify the authenticity of every driver's license presented to them.  Yet this is either impossible or, at a minimum, wholly impractical.  It may be impossible because the DMV's power to disclose the information it collects is heavily regulated by statute.  (E.g., Veh. Code, § 1808.21 et seq.; Veh. Code, §§ 12800.5, subd. (a)(2) [limiting disclosure of photographs and other identifying information], 12800.7, subd. (b) [limiting disclosure of personal information].)  It is in any event wholly impractical because verification by the DMV, even if possible, may take days or weeks, yet the execution of documents important enough to necessitate notarization is usually an activity for which time is of the essence.

North American responds with two further arguments.  First, it contends that its construction is dictated by the plain text of section 1185, which calls for a "driver's license *issued by the [California] Department of Motor Vehicles*."  To be sure, the text of a statute is often the best indicator of its meaning.  (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386-1387.)  But it is not the exclusive indicator, and is not to be construed in a manner that leads to absurd results, as North American's proffered construction does.  Second, North American points to a panoply of pre-1982 cases interpreting section 1185's requirements, including *Joost*, *Anderson*, and *Transamerica*.  Although these cases remain relevant to establish

13

that compliance with section 1185's requirements erects a safe harbor, they are no longer relevant in defining those requirements because our Legislature greatly relaxed those requirements in 1982: Prior to 1982, the safe harbor only applied if the notary "*kn[e]w* that the [person] making the acknowledgment is the person described in the instrument" either based on personal knowledge or upon the sworn affidavit of a credible witness (*Anderson, supra*, 181 Cal. at p. 299); in 1982, the safe harbor was expanded to apply in a variety of additional situations, including when a notary reasonably relies on an authentic-looking driver's license. (Stats. 1982, ch. 197, § 1.)

> b. *Can section 1185's safe harbor be altered by expert testimony regarding industry custom?*

In opposing summary judgment, North American submitted a declaration from an expert opining that Gugasyan was negligent in verifying the identity of the person purporting to be Gabay because (1) industry custom requires a notary to get "clear thumbprints," but the thumbprints Gugasyan obtained appeared to be smudged in the copies of Gugasyan's notary journal, (2) industry custom requires a notary to have "a separate line item entry in the notary journal," but Gugasyan used a single line for "two documents," and (3) industry custom requires a notary to follow whatever special procedures the escrow holder requests, but Gugasyan did not obtain a copy of Gabay's driver's license despite North American's purported request that he do so.

To begin, glaringly absent from the declaration of North American's expert is any opinion that the license or other circumstances regarding the notarization of the deeds of trust should have rung any alarm bells for Gugasyan; therefore, the

14

industry customs the expert raises are not relevant to the requirements triggering section 1185's safe harbor.

What is more, we reject the notion that a party can, by expert testimony, redefine a statutory safe harbor fashioned by our Legislature. In section 1185, the Legislature specified that a notary is presumed to have acknowledged a document in accordance with the law if he follows certain protocols in confirming the identity of the person executing the document. If parties could, through expert testimony, effectively change the protocols a notary has to follow before the safe harbor applies, section 1185 would become less of a safe harbor and more of a moving target. For instance, North American's expert goes so far as to suggest that a notary should be denied the safe harbor for failing to acquiesce to an escrow holder's case-specific requests. Under this approach, if a party were to request that the notary verify with the DMV that the driver's license presented was legitimately issued, a notary would be liable for his failure to do so, and individual parties would be able to entirely rewrite the safe harbor in a manner contrary to the very construction we give to it today. We decline to construe section 1185 in a manner that would so drastically undercut its efficacy. North American resists this conclusion. Citing *Lipscomb v. Krause* (1978) 87 Cal.App.3d 970, 975, *Scott v. Rayhrer* (2010) 185 Cal.App.4th 1535, 1542, and other cases, North American asserts that experts regularly opine on whether a professional has satisfied the pertinent standard of care. This assertion is true, but irrelevant. Experts may opine on what is necessary for a professional to act reasonably in discharging her professional responsibilities. As noted above, however, section 1185 does not merely require that a notary act "reasonably"; instead, it specifically prescribes what

15

must be done for a notary to qualify for its safe harbor.  For the reasons noted above, expert testimony cannot add to those statutory prerequisites without destroying section 1185's function as a safe harbor.  (Accord, *Huang v. Garner* (1984) 157 Cal.App.3d 404, 415 fn. 9 ["where the statute supplies the standard of care expert testimony would not be required"], overruled on other grounds by *Aas v. Superior Court* (2000) 24 Cal.4th 627.)

                c.     *Is section 1185's safe harbor negated if the notary ends up being duped by the fake driver's license?*

North American suggests that a notary's negligence must be inferred—and that this negligence overrides the safe harbor—from the simple fact that the notary did not detect a fraudulently presented driver's license.

We reject this argument for two reasons.  First, it is inconsistent with section 1185's plain language.  If, as North American suggests, the failure to detect a fake ID mandates an inference of negligence sufficient to impose liability, then the liability of notaries would be strict, not negligence-based.  Yet section 1185's safe harbor turns on whether a "reasonable person" would be fooled and hence on whether the notary "reasonabl[y] relie[d]" on that ID.  (§ 1185, subd. (b) & (b)(3)(A).)  We decline North American's invitation to rewrite section 1185 to make notaries strictly liable for even their reasonable mistakes.  (*Joost, supra,* 131 Cal. at p. 509 ["A notary may take all due precautions and fully comply with [section 1185] and still be deceived.  In such case he would not be held liable"]; see generally *California Teachers Assn. v. Governing Bd. of Rialto Unified School Dist.* (1997) 14 Cal.4th 627, 633 [courts have "'no power to rewrite [a] statute'"].)  Second, North American's argument is, at

16

bottom, a request to apply the doctrine of res ipsa loquitur.  The doctrine of res ipsa loquitur erects a presumption of negligence, but it only applies when "'(1) the event must be of a kind which ordinarily does not occur in the absence of someone's negligence; (2) it must be caused by an agency or instrumentality within the exclusive control of the defendant; [and] (3) it must not have been due to any voluntary action or contribution on the part of the plaintiff.'" (*Howe v. Seven Forty Two Co., Inc.* (2010) 189 Cal.App.4th 1155, 1161.)  The doctrine is inapplicable here because fake IDs fool careful people all the time; that is in part why the Penal Code makes the use of fake IDs a crime.  (Pen., §§ 148.9, 529.)  We thus refuse to adopt a holding that would effectively apply res ipsa loquitur in a situation when its prerequisites are lacking.

      2.    *Applying section 1185's safe harbor*

Properly construed, the safe harbor in section 1185 warrants the entry of summary judgment in this case.  As noted above, section 1185's safe harbor applies if a notary (1) is "present[ed]" with and "[r]easonably reli[es]" upon a driver's license that purports to be issued by the DMV, and (2) does not encounter any other "information, evidence, or other circumstances that would lead a reasonable person to believe that the person making the acknowledgment is not the individual he or she claims to be."  (§ 1185, subd. (b) & (b)(3)(A).)  Here, Gugasyan declared that his usual practice was to carefully examine the driver's license presented to him to make sure that the name, signature, and photograph on the license matched the name, signature, and appearance of the person appearing before him; to examine the license itself for authenticity in terms of texture and color; to record the information on the license in his

17

notary book; and to refuse to notarize a document if there were any irregularities.  Because Gugasyan notarized the deeds of trust and recorded the driver's license information provided on both occasions in his notary journal, Gugasyan's declaration establishes that he was presented with and reasonably relied upon a license purporting to be issued by the DMV and that he had no other evidence at the time that would give him pause. North American provided no contrary evidence.  Indeed, as noted above, even its expert did not speak to the reasonableness of Gugasyan's examination of the license; instead, the expert said Gugaysan should have done more to make it easier to catch the imposter after the fraud was discovered (such as taking a clearer thumbprint, having additional signature lines, and making a copy of the license).  As such, the undisputed evidence raises no triable issue of fact on whether Gugaysan complied with section 1185.

> 3.      *North American's arguments*

North American resists this conclusion with a plethora of arguments that we have wrangled into four pens.

First, North American raises several evidentiary objections.

North American contends that Gugasyan's declaration is entitled to no weight because (1) he did not specifically declare that he followed his usual custom as to the two notarizations at issue here, and previously stated in a deposition that he could not remember the two specific notarizations in this case; (2) he did not specifically declare that a driver's license had been presented to him; (3) he did not provide proof that the person appearing before him executed the two deeds of trust in his capacity as a representative of Noble Investments LLC; and (4) the trial court has the discretion, under Code of Civil Procedure section 437c,

18

subdivision (e), not to credit the declaration of the sole witness to an event.

Each of these challenges to Gugasyan's declaration lacks merit. Contrary to what North American suggests, Gugasyan *did* declare that he followed his usual custom and practice. His declaration set forth his "custom and practice" "[a]t all times relevant herein." It is hard to think of a time *more* "relevant herein" than the times he notarized the two deeds of trust underlying this lawsuit. (Accord, Evid. Code, § 1105 ["evidence of habit or custom is admissible to prove conduct on a specific occasion in conformity with the habit or custom"].) What is more, Gugasyan's notary journal constitutes uncontroverted evidence that he followed his usual custom and practice *in this case* because the journal contains entries for both notarizations with all of the information he declared it was his usual practice to record. North American is effectively asking us to read Gugasyan's declaration as indicating his "custom and practice" "[a]t all times relevant herein *except the two most pertinent times.*" The maxim that we construe evidence liberally against summary judgment does not empower us to rewrite declarations to favor the nonmoving party. North American's next argument that there is no evidence that Gugasyan was presented with a fake driver's license is contradicted by North American's own separate statement, in which it listed as undisputed facts that Gugasyan "was presented with a fake ID at the signing" relating to the first and second deeds of trust. The absence of proof that the person pretending to be Gabay was acting as the representative of Noble Investments LLC is irrelevant: It is undisputed that the *real* Gabay is the president of Noble Investments LLC; the problem is that the person who executed

19

the deeds was not the real Gabay.  And while a trial court has discretion to deny summary judgment "if the only proof of a material fact offered in support of the summary judgment is a[] . . . declaration made by an individual who was the sole witness to that fact" (Code Civ. Proc., § 437c, subd. (e)), "'the converse is also true, and a court has the discretion to grant a motion for summary [judgment] under such circumstances as well.'" (*Trujillo v. First American Registry, Inc.* (2007) 157 Cal.App.4th 628, 636, overruled on other grounds by *First Student Cases* (2018) 5 Cal.5th 1026.)  Here, North American has made no effort to explain why the trial court abused its discretion in relying upon Gugasyan's declaration.

As its final evidentiary challenge, North American faults the notaries for not producing Gugasyan's original notary journal, suggesting that its absence is somehow nefarious.  North American conveniently neglects to mention the reason *why* the original has yet to be disclosed—namely, because the FBI seized it as part of an investigation into the fraud.  The absence of the original journal is of no consequence under the secondary evidence rule in any event.  That rule allows a trial court to rely upon a copy of a writing unless "[a] genuine dispute exists concerning material terms of the writing and justice requires the exclusion" or "[a]dmission of the" copy "would be unfair."  (Evid. Code, § 1521, subd. (a).)  Here, the color copies of the journal submitted to the trial court are remarkably clear.  As discussed more fully below, there is also no genuine dispute regarding the material terms of the journal.  We also perceive no abuse of discretion as to why admission of the copy when the original apparently is in the FBI's possession is unjust or unfair.

Second, North American asserts that there are other triable issues of fact that preclude summary judgment. It articulates two. To begin, North American posits that there is a dispute over whether, in Gugasyan's notary journal, he recorded the last digit of the driver's license presented to him with respect to the second deed of trust as a "1" or a "0"—North American reads Gugasyan's handwriting as being a "0," while Gugasyan says it was a "1." North American urges that this dispute is material because, if the last digit is a "0," then the person pretending to be Gabay would have presented driver's licenses with two different numbers, which should have put Gugasyan on notice that something was amiss. From our examination of the notary journal, it is not clear that what North American sees as a "0" is anything more than a sloppily drawn "1." So there may be no dispute at all. Further, we do not believe that any such evidentiary dispute is sufficient to overcome the presumption in section 1185. Gugasyan testified that he conducts between 10 and 15 notary appointments per week, so he likely completed between 40 and 60 other appointments between the two with the imposter at issue in this case. To adopt North American's proffered inference that Gugasyan should have recalled that the driver's license presented at the second appointment had a one-digit discrepancy compared to the license presented at the first appointment would impose a burden on notaries of recalling every appointment and investigating every driver's license—a requirement not embodied in section 1185's "reasonable notary"-based standard. Indeed, North American failed to submit evidence supporting such an implausible inference; its own expert offered no opinion that a reasonable notary in Gugasyan's position would have recalled that the appointment was with a

21

repeat customer and thus should have reviewed the driver's license information in his journal to investigate whether the licenses presented were the same (and hence more likely to be legitimate). Further, North American argues that there are triable issues regarding proximate causation. Because we have concluded that summary judgment is appropriate based on section 1185's safe harbor, we have no occasion to address this possible alternative ground for summary judgment.

Third, North American argues that the trial court erred in granting summary judgment for Aintablian. We reject this argument. It is undisputed that Aintablian's sole role was as Gugasyan's superior, and that any liability he had was solely vicarious. (See generally *Perez v. Van Groningen & Sons* (1986) 41 Cal.3d 962, 967 [discussing vicarious liability for an employee's torts].) Because we have concluded that Gugasyan is not liable, it follows that Aintablian is also not liable. What is more, Aintablian moved for summary judgment along with Gugasyan. On these facts, it makes no sense to grant summary judgment for Gugasyan but not Aintablian.

Fourth, North American argues that the trial court erred in ruling on the summary judgment motion without granting a continuance so that North American could obtain further proof that the license presented to Gugasyan was not issued by the DMV. There was no error. Code of Civil Procedure section 437c, subdivision (h), provides in pertinent part that "[i]f it appears from the affidavits submitted in opposition to a motion for summary judgment . . . that facts essential to justify opposition may exist but cannot, for reasons stated, be presented, the court shall deny the motion, [or] order a continuance to permit affidavits to be obtained or discovery to be had . . . ." (Code Civ.

Proc., § 437c, subd. (h).) The trial court did not abuse its discretion in declining to continue the summary judgment hearing because further discovery to establish that the license presented to Gugasyan was not issued by the DMV was not "essential" because that fact was undisputed and already established by other evidence.

## II. Demurrer Ruling

North American argues that the trial court erred in (1) not granting leave to amend its complaint after sustaining a demurrer to its claims for declaratory relief and negligent misrepresentation, and (2) striking its prayer for attorney fees on a "tort of another" theory. Because North American does not meaningfully challenge the trial court's ruling that its declaratory relief and negligent misrepresentation claims were deficient as pled, our task on appeal is limited to asking whether the court abused its discretion in denying leave to amend because there is a "reasonable possibility that the defect can be cured by amendment." (*Loeffler v. Target Corp.* (2014) 58 Cal.4th 1081, 1100.) A plaintiff may articulate a valid amendment even for the first time on appeal but bears the burden of articulating the "specifi[c] way" that the operative complaint can be amended to state a claim. (*Align Technology, Inc. v. Tran* (2009) 179 Cal.App.4th 949, 971; *CAMSI IV v. Hunter Technology Corp.* (1991) 230 Cal.App.3d 1525, 1542.) A possible amendment is not valid if it is foreclosed as a matter of law. (*California Department of Tax & Fee Administration v. Superior Court* (2020) 48 Cal.App.5th 922, 938.)

The trial court did not abuse its discretion in denying leave to amend North American's claims against the notaries for declaratory relief or for negligent misrepresentation.

23

North American's claim of error for the declaratory relief claim fails for one, and possibly two, reasons. First, and as a threshold matter, North American's proposed amendment to this claim may face a procedural bar. North American argues that it can amend its declaratory relief claim to allege that the notaries did not adhere to the terms of the contract Aintablian originally signed with North American, which obligates Aintablian to indemnify North American and to assign to North American all rights to the insurance policy he carries for any errors or omissions. North American first presented this proposed amendment after learning of the trial court's inclination to grant summary judgment. The law is well settled that a trial court does not abuse its discretion in denying a request for leave to amend made for the first time at the hearing on summary judgment. (*580 Folsom Assocs. v. Prometheus Development Co.* (1990) 223 Cal.App.3d 1, 18; *Shugart v. Regents of University of California* (2011) 199 Cal.App.4th 499, 508; *Leibert v. Transworld Systems, Inc.* (1995) 32 Cal.App.4th 1693, 1699.) North American's argument that the court abused its discretion because that late request was preceded by a successful demurrer is ostensibly an end run around the rule that requires amendments to be made in a more timely fashion. Second, and in any event, North American's proposed claim fails as a matter of law. The claim fails against Gugasyan because he is not a party to the Aintablian-North American contract. More to the point, the claim fails against both defendants because their duty to indemnify and the insurance company's potential coverage only matters if the notaries engaged in some underlying negligence; as we have concluded above, North American failed to overcome the conclusion dictated by the safe harbor that they did not.

24

North American's claim of error as to the negligent misrepresentation claim also fails for two reasons. First, North American abstractly states that it can "provide more details" regarding (1) the misrepresentations Gugasyan made in his acknowledgment that the person appearing before him was Gabay, and (2) the misrepresentations Aintablian made in applying to be on North American's list of approved notaries. This vague promise of a desire to "add more details" without specifying what they are falls short of what a plaintiff's burden is to articulate the "specific ways" its complaint can be amended. Second, these claims fail as a matter of law. Negligent misrepresentation requires underlying negligence in making a representation (*Daniels v. Select Portfolio Servicing, Inc.* (2016) 246 Cal.App.4th 1150, 1166), and we have concluded that the safe harbor insulates Gugasyan from negligence liability as a matter of law. The absence of any negligence by Gugasyan also means that any misrepresentation by Aintablian in applying to become a notary in the first place has no causal connection to the damages North American suffered here.

Because we have concluded that North American states no claims against the notaries, we have no occasion to decide whether they may seek attorney fees under the "tort of another" doctrine for such claims.

## III.   Dismissal of Other Defendants

North American lastly asserts that the trial court erred in ordering the dismissal of the entire case once summary judgment was granted in favor of the notaries because North American still had claims pending against Western and Finance. Because the court did this without affording North American notice and an opportunity to be heard, North American continues, the court

25

violated its right to due process.  (*In re Marriage of Stracyznski* (2010) 189 Cal.App.4th 531, 538.)  Because this is a constitutional claim, our review is de novo.  (*Conservatorship of John L.* (2010) 48 Cal.4th 131, 142 [due process challenge].)

### A.  *Western*

The trial court did not err in dismissing Western.  Western was the surety for Gugasyan.  As such, Western's liability to North American rises or falls on whether North American has a claim against Gugasyan.  (*Cates Construction, Inc. v. Talbot Partners, Inc.* (1999) 21 Cal.4th 28, 38 ["In the absence of default, the surety has no obligation"]; *Breckenridge v. Mason* (1967) 256 Cal.App.2d 121, 130 ["when on an official bond and primary obligation is barred or in any legal way extinguished, the surety is relieved"]; *Hungate v. Indemnity Ins. Co. of North America* (1933) 129 Cal.App.133, 135 [a notary's "bond is executed for the purpose of protecting those who may suffer by his dishonesty and the bondsman is liable for damages resulting from the fraudulent acts of the notary committed in the performance of his duties"].)  Because North American vigorously litigated the question of whether it had a claim against Gugasyan and does not articulate a way in which Western can otherwise be liable, North American had ample notice and opportunity to be heard regarding Western's liability.  As a result, the court's dismissal of Western was legally appropriate and complied with due process.

### B.  *Finance*

The trial court erred in dismissing Finance.  Finance's liability for brokering the loan by the imposter is separate and distinct from the notaries' liability.  What is more, the court previously struck Finance's filings and entered a default against Finance, meaning that Finance is ostensibly liable to North

26

American.  Dismissing Finance was improper, and we reverse the dismissal order as to Finance.

## DISPOSITION

The order dismissing North American's claims against Finance is reversed and remanded for further proceedings.  The order dismissing North American's claims against Aintablian, Gugasyan, and Western is affirmed.  Aintablian, Gugasyan, and Western are entitled to their costs on appeal.

**<u>CERTIFIED FOR PUBLICATION</u>.**


_____, J.

HOFFSTADT


We concur:


_____, Acting P. J.

ASHMANN-GERST


_____, J.

CHAVEZ